We call this case Rolled up last night. I was a little confused. That was the last one. That's amazing. The last one. All right. Thank you. I had this rolled up. So do I. Yeah, so do I. Good morning, Your Honor. Mark Kendall from Schatz Noble Lizard for the plaintiff appellant Frank Whiting. With the court's permission, I should like to reserve two minutes for rebuttal. Of course. The district court erred in dismissing the plaintiff's one and only complaint with prejudice for failing to state a cause of action under the securities laws. The key to understanding this case is to understand why it was misleading the defendants to talk about their backlog, to give a quantification of their backlog. Can I just do one quick footnote? Are you saying that there was no opportunity to amend? That's correct, Your Honor. No opportunity. And this is not a case where there was an opportunity to amend, but you chose to stand on the complaint? Your Honor, your first and only complaint was dismissed with prejudice? Yes, Your Honor. That's correct. Go ahead. Did you request an opportunity to amend? We had requested it in our brief, Your Honor, saying that in the event that the court found that the allegations were insufficient, we would request leave to replete. After the court ruled, did you reassert your application to amend? No, Your Honor, we didn't because the court had made a determination in the end that the very theory of fraud that we had relied upon was so flawed that there could be no amendment. We believe that that determination was wrong as a matter of law and needs to be reversed here before there was any utility in going back and repleting. Okay. But if we were to agree with the district court that the theory is defective, I'm not saying we were, but I'm just saying if we were to do that, do you still want a chance to go back and replete? If the theory is defective, Your Honor, no. We have no desire to waste the court's time. If the court determined that our theory was defective, it would indeed be true. So in essence, the fact that you weren't given a chance to replete is so no harm, no foul? It could be, Your Honor. We hope that it is not. So tell us why the first challenge statement you pledged supports what facts – how does that support scienter? The challenge statement about backlog supports scienter because it is clear, based on all of the allegations that we've put in the complaint, that the defendants actually knew about these stock work orders, which rendered that backlog statement materially misleading for reasonable reason. Well, suppose they knew about the stock work orders. But where – let's say the statement is not accurate. Where is the scienter? You have to prove not only that it's not accurate, but that they knew it wasn't accurate, and they purposely did this for – Your Honor, I think that if you – You tend to mislead. Yeah. Your Honor, I think that the way that this Court in America West, for example, and in other cases has looked at this, where you have a omitted fact that renders this – where you have a statement which is misleading, which is materially misleading on an objective basis, and you know, based on the allegations of the complaint, that the defendants were aware of those omitted facts, that is sufficient for scienter. Well, you know, see, I'm having a problem here. Every false statement does not mean that there is an intent to mislead. It just may be an incorrect statement. That happens all the time. Just because it's not true doesn't mean anyone was trying to mislead. They just might be negligent. They may be uninformed. They may be inaccurate, but it doesn't mean that they made the statement with the intent to mislead, does it? Well, Your Honor, I think that the intent to mislead is the intent, either knowing or deliberately reckless, to make this statement which is either false or materially misleading. How about that they got a stop work order, disclosed it, the stock price went down, they got subsequent stop work orders, and they did not disclose them. Wouldn't that be proof of scienter? Absolutely, Your Honor. Absolutely. Now, I was going to say, if there was a further requirement that you had to establish not only that they were aware of the fact which rendered their statement false or misleading, but that they were somehow aware that the fact rendered their statement false or misleading. If we had to establish that, we have that on these facts. We have it in a couple of different ways. The first way is that the very first time that the defendants talk about backlog at all in the pleadings, the 10-K report that's filed in 2000, the 2003 10-K report which was filed in the spring of 2004. They talk about backlog. And they say, we believe that these backlog numbers that we report are firm, subject to the possibility that they can be canceled or there can be delays of the like. That demonstrates that the management recognizes that there is a connection between the backlog numbers, a necessary connection between the backlog numbers, and the fact that they can be canceled or there can be delays of the like. Now, even if the stock work order was disclosed, stock work order number one, on September 9th, the stock didn't change. According to your complaint, the stock didn't drop until September 13th. Correct, Your Honor. So, you know, no foul, no wrong. I mean, even the market didn't pay any attention to stock work order number one. Well, the chronology is set out in the complaint, Your Honor, is that the SEC filing was made after the market closed on September 9th, which was a Thursday. But doesn't that gut your theory of causation, that the day that the market gets wind from the source, that there's a stock work order, nothing happens? So not only do we have a question of causation and materiality as to the stock work order in the first place. The stock did go down in the week following the disclosure, didn't it? Correct. I think that the important thing, Your Honor, is that there was an intervening event. Just before the market opened on Monday, one of the analysts that tracked this stock put out a report that said, hey, I've looked at this SEC filing, and guess what? There's a surprise there. Everything that they said back in August, on August 24th, that's all true. They've got the backlog. They have the sales. But they disclosed this additional fact, this additional fact that they've received a stock work order with respect to their largest single contract. They didn't tell us that before. And I'm changing my rating on this stock. I'm downgrading the stock because of this changed circumstance. That comes out, the market sees it, and there's an immediate reaction. The stock drops 9 percent that day. Yeah. But for a stock work order, it took them almost a week for the stock to go down after the market knew of the stock work order. And on stock work orders two through four, the company declined in revenue. How did that ‑‑ how does that connect with the decline in revenue in the first quarter of 05? What happened, according to the allegations that we have in the complaint, Your Honor, is that with respect to stock work order number three, they originally Well, two through five, four, I'm concerned with. All three of them. Correct. But the allegations that are really particularly strong with respect to what happened in the December to February time frame is that with respect to stock work order number three, they received this order in the August to September time frame. They initially stopped work for about a week. And then they made the determination to go ahead and work on that even though they had received the stop work order. And they devoted 50 to 75 workers in their headquarters continuing to work on this project for whatever reason. Perhaps they felt that they would be able to work things out. Perhaps they didn't. But under the terms of a stop work order, you can't be paid for that work while the stop work order is extant. And as the confidential witnesses indicated, they continued this work all throughout 2004, and they didn't pull the plug on it until January of 2005. Now, the company's fourth quarter ended on October 31st. So that would have been some period into this time when they're doing work without getting paid. And then the first quarter of 2005 commenced the beginning of November and went through the end of the month of that period where you have a sizable percentage of Applied Signals' total workforce being devoted to working on this project for which they are not getting paid. That has an impact on their revenue. And so when the revenue is down by 25 percent quarter over quarter when they announced their results for the first quarter of 2005 in February, it's no surprise. Your confidential sources are a couple of engineers and a technical editor. Correct, Your Honor. Relatively mid-level, not upper echelon type people. How would we know that they're privy to such confidential information as to the total value of a particular contract? I mean, how would they know that? Your Honor, what they are capable of testifying to is what they've testified to in the complaint, which gives a sense of the magnitude. They know how many workers are devoted to the project. So when they're talking about 50 to 75, we don't know the exact dollar amounts. But it's impossible to conclude that such a large percentage of Applied Signals' workforce is devoted to a project without it being extremely material. That's the kind of information that they can provide. They can provide information about the fact that you get a stop work order because it's just not something that a person who's working on a project would know. I'm just making sure I understand. Is your theory that the failure to disclose a stop work order is tied to the fact that they talk about backlog? Or would it be you think they have a duty to disclose that kind of bad news regardless? No, Your Honor. They do not have an affirmative duty to disclose it. The only reason why they had a duty to disclose, and this time we've been very clear on this in our brief, is that they made the statements about backlog and subsequently made other statements that implied that they had not received them. So in your view, to come up with an analogy, it's sort of the flip side of the coin. If you start talking about backlog, you have to disclose the flip side, which is the mere fact that it's not a real backlog. Correct. And the mere fact that backlog doesn't necessarily imply a cancellation is not determinative. The fact that it is contingent under Basic v. Levinson and under Judge Hawkins' decision in SEC v. Fain, if you've got a contingent liability and it's significant. It's our decision. I apologize, Your Honor. That's right. Even though it's contingent, if it's significant, you have to disclose it when you're giving this positive news about, in this case, backlog. Thank you, Your Honor. We'll hear from this side. Thank you, Your Honor. May it please the Court, I am David Priebe with my colleague Shirley Weiss, representing Applied Signal Technology and the individual defendants. And I'm as nervous as I'll get out, so I'll try to do my best. When you state you have a backlog, don't you have to state that it's subject to a stop work order? I mean, a backlog is saying you have so much in the pipeline when you really don't have it. Every time Applied Signal talked about backlog, it said it was based on contracts which are subject to not only stop work orders, but contractual provisions that may cancel contracts entirely. I know, but one moment. Right. I know. But this backlog, all government contractors are subject to these conditions and contingencies. Right. But this backlog actually had a condition attached to it at the time you announced the backlog. I would say — Is it a half-truth to tell the public I have a backlog for such and such contracts without telling the public incidentally the government's got a stop work order on this? The important point, completely ignored by plaintiff's counsel, is that a stop work order does not cancel or terminate a contract. All a stop work order does is it's uncontested matter. Well, it has a potential to cancel it, though. It's not even that. It's that it only lasts for 90 days at most. It only stops work for 90 days. That's its maximum shelf life. Unless affirmative action is taken on the part of the government, it becomes a dead letter. It goes away. To me, that would be a great argument if we were here on a summary judgment grant. Can I finish? Sorry. Excuse me. But this is Rule 12. And we accept what's in the complaint, if it's well pled, as true. This is not a proof situation. A stop work order, admittedly, can have a variety of effects from inconsequential to very serious to an entity that engages in government contract work like your client does. But this is Rule 12. This is not summary judgment. But plaintiffs have an affirmative obligation under the Reform Act to plead all facts giving rise to falsity and a strong inference of scienter. Okay. They've pled the fact that you disclosed a stop work order in September of 2004, and in the ensuing few days, the stop price went down, and then you received two or three more stop work orders, which you never disclosed to the investing public. That's what the complaint says. Well, that's what the complaint says, isn't it? For part of the case, yes. Right. That only concerns the alleged nondisclosure of the purported two, three, and four. So there, there would be no issue. Are you saying that these stop work orders didn't happen? I'm saying absolutely that it is not pleaded, that number two, three, and four happened. Moreover, it is not pleaded. None of their sources have any connection to backlog. It's conceded here that there's no duty to disclose any stop work order unless it's clear. I just want to be very clear about this. I'm being very clear. Are you telling, and listen to the question, because this is very serious for me. Are you saying that your client did not fail to disclose stop work orders received in May, June 2004, August, September 2004, or December 2004? That is what I'm saying. I'm saying they disclosed a stop work order, which plaintiffs call number one, the chronology, even by their own account it matches three and four. They disclosed that separately. With respect to the others, either they were disclosed or they didn't have to disclose anything in the first place because it was never included in backlog. And it's agreed, and it's only because they gave a backlog number that there may be duty to disclose these things anyway. Plaintiffs have no sources that say anything about what went into backlog. As your Honor's decision in Kalpers v. Chubb explains, if the sources are not in a position to be able to talk about a topic, and here it's the key topic, they're not adequate sources. Are you also telling this panel that the complaint does not allege a failure to disclose stop work orders? Yes. I'm contending either to disclose them or not to include them in backlog in the first place. Yes. I would be, I would like to hear your argument concerning, because I don't know about my colleagues, I'm satisfied that when you give a backlog, you should tell if there's any stop work order that's attached to the backlog. I would like to hear you argue that there is no scienter here and what the connection is between the stock going down, since that's somewhat troubling to me. Well, there's no scienter as to number one, because the only allegation is that it was 16 days too late. That should have been disclosed on August 24. The very fact that they disclosed it on September 9 is contrary to an inference of scienter. You don't, you don't intend to conceal something when you've disclosed it. There are some additional post. It was disclosed. It was disclosed a couple, late, but it was disclosed. Correct. Now, why don't you go into scienter and the connection between the stop work orders and any business stock going down? You mean as to the other stop work orders? Well, as to all four of them, yeah. Well. But especially stop work order number one. Right. Well, the note is you have. Stop work order is their longest and strongest suit, if you're a bridge player. Right. Well, we don't know that stop work number one existed as of August 24, because its 90-day period was about to expire. And if it expires, it has no, in fact, influence on backlog. The backlog is the future revenue. If it's about to expire, unless there's affirmative action taken to renew it, it goes away. They don't know what's in the affirmative action. As to the others, we do contend there are no allegations that the other stop work orders even existed as a, from proper sources as separate stop work orders. That's proof. That's a question of proof. It may well be, if the panel determined to send this case back, that following discovery, you would be able to establish that there was not three stop work orders, that some or all of them were, in fact, disclosed, et cetera, et cetera. But we're faced with a complaint. And you told me about five minutes ago that the complaint does not allege that. I'm looking at paragraph 30 on excerpt of record 11-12. It clearly alleges that. I'm saying it doesn't have enough for the pleading standards of the reform act. Okay. Here's what 30 says. The amounts reported as backlogged by the defendants on August 24, 2004, that's pretty specific, isn't it, as described in paragraph 28 above and reported again as backlogged by the defendants in the third quarter 10-Q as described in paragraph 29 above, were materially false and misleading because the defendants failed to disclose that they had received another stop work order in late May or early June 2004, paren, stop work order number two. If the stop work order goes away, unless it's renewed, it doesn't have any effect. Great. You prove that it goes away, great. How does that answer the Rule 12 question? Rule 12 is modified by the Reform Act. Hmm? Because Rule 12 is modified by the Reform Act because it's their obligation to show that the backlog number. Does the Reform Act say that a defendant can, at the Rule 12 stage, establish that something alleged in the complaint is not true? The Reform Act does allow defendants to say that it is inadequately pleaded for. Does it dispute half a century of Rule 12 law that we take the complaint, the well-pled allegations of the complaint as true for Rule 12 purposes? At least with respect to scienter, which in this Court is tied to falsity, yes, it does. My question is whether you have any authority to support the proposition, the argument that you've just made that the Reform Act changes that basic element of Rule 12 law, which is that we take the complaint as true, which you must state affirmatively in making a Rule 12 motion, right? Correct. It does modify it to the extent that the allegations are not well pleaded and to the extent that they are anti-scienter inferences, and that's Gomper and Tell-Labs. Thank you. You know, I'm still not sure I understand your position, so help me out here. Do you disagree with the basic proposition that if they have talked about backlog, they have to disclose any stop orders? Let me finish. You cannot let me finish. You're not going to answer the wrong question. See, the point of sitting there is listening to the question. Try to imagine or try to understand what I'm trying to ask you, okay? Do you dispute the basic proposition that if you start talking about backlog, you have a responsibility to disclose any stop order that applies to the backlog you have talked about? Do you dispute that proposition? A yes or no answer would be, for starters, would be most likely. For any revenue in backlog, no, I don't dispute it. But I do dispute for any revenue that is in backlog or that was affected by a stop work order, no. If the revenue affected by a stop work order was never in backlog in the first place, you don't have to say, here's my backlog number, and by the way, it would have been different if we had these stop work orders. I understand what no means. I really do. I'm trying to understand. Listen, sir. I do understand what no means. So your position, if I understand it correctly, then, is they have not alleged that the public disclosures about backlog included orders that were affected by stop orders 2, 3, and 4. Precisely. Thank you. Okay. Thank you. Thank you. Which will be my question to opposing counsel as he stands up to talk. This is their claim. Their claim is that you've said they've talked about backlog, and you also said they didn't disclose stop orders, but you have not alleged that the stop orders that they failed to disclose have anything to do with the backlog as publicly announced. Your Honor, that's not true. We certainly alleged that the stop work orders, the contracts, the portions of contracts affected by the stop work orders were included in the backlog. The support for that is two things. It's not based on confidential witnesses. It's based on the company's own statements. What would be most welcome at this point would be a paragraph number in the complaint. If you can point me to a paragraph number of the complaint that says that, then you probably will win. If you can't, then you may lose. So that's the thing that would fit the bill right now. Okay. In paragraph ñ I have the excerpt of record. It would be most helpful if you could give me a page number. Yes. Excerpt of record, page 14, Your Honor. Okay. In paragraph 35, for example. But 35 has many parts. It does. Line number on page 14. Beginning at the very first line, Your Honor. It says, The amounts reported as backlog by defendants on December 21st, 2004, on January 14th were materially false and misreading for the following reasons. And then it says on line 8, beginning on line 8, the backlog numbers failed to disclose that they received another materially adverse stop work order involving the largest customer. Well, no. It says stop work order, period. Correct. Oh, I'm sorry. I was going down further. You're skipping around. You may know exactly where you're going. But my eyes are still on line 11, which is ñ So where does it say these are stop work orders that relate to the backlog that they have disclosed publicly? Where do you see that allegation? You know what, I don't want to put you on the spot. Would you like to send us a letter? I would be happy to, Your Honor. A so-called Tony H.J. letter?         Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. I would be happy to. It's sort of important, and, you know, we'll submit the case, but we won't make a decision in the next ñ If I could briefly address that question one further way, though, Your Honor, I think that it's important to look at this. The company defined how contracts got into backlog in their 10-Q. They said, we book a contract into backlog as soon as it's signed by both parties. So we're dealing with a signed contract. And we know from there the way that the company dealt with stop work order number one, that they don't remove a contract from backlog unless and until they actually get a cancellation. In December of 2004, they are asked during their conference call about their $143 million backlog. And they're specifically asked two things. One, they're asked, is there some chance that this stop work order is, in fact, going to be rescinded? And they expressly say, it's our understanding at this point, it's a virtual certainty that we're going to get a cancellation on that. And then they're subsequently asked, does this $143 million still include the $10 to $15 million that's affected by stop work order number one? They say, yes, it does. So that's how we know ñ Yeah, but we're not involved with the 10-K here, are we? This is the conference call. But, Your Honor, my point is simply that if you know that based on what they say in their 10-Ks, how backlog is initially booked is when you have a signed contract. And you know ñ For purposes of the Reform Act, we're not looking at the 10-K. We're looking at the complaint. Well, Your Honor, the 10-K was incorporated so when the court was looking at this, the trial court was looking at this, that it had all of that in front of it. Now, that is an issue. That's the sort of issue where if that were found to be ñ What you're saying is you've alleged the methodology as the prior dealings, and therefore it can be inferred that they use the same methodology later. That's your theory? That's correct, Your Honor. You don't have any actual proof of that, right? You don't have any secret witnesses that say when they talk about backlog, they include everything, including the stuff that was subject to the stop order. That's correct. We do not have that. So is that enough under the PSRA? I believe so, Your Honor. I heard Mitchell's voice here. You too. You know, the Supreme Court in Tel Aviv basically said when you're looking at this That's sufficient. And here you say the company tells us how they do their backlog, and they show us how they do their backlog. The most reasonable inference is that that's how they do their backlog. Okay. Is that your answer to my question? What I'm asking you is you don't still need to write me another, right? That's going to be your ñ I know this is a complicated complaint, and there may be more in here. I will check to see if there is something additional. If that's your complete answer, don't feel you have to write it. If there's something else, some other allegation here that you think is relevant, you can feel free to do so. Of course, the other side can write a counter 28-year letter. It's sort of a mini post-argument briefing. But it's complicated. These are complicated complaints. But don't feel like you have to do it if there's nothing else. That's right. But, you know, just in closing, if I could say one thing, that that is the type of issue where if the only issue was, well, you didn't quite put it in the complaint right, then we should have been allowed to replete, not this whole question of, you know, whether we ñ our whole theory of fraud was wrong. Right. If a pleading by simply saying, well, we claim this is enough, but under the Reform Act you sometimes have to say, well, more than that. I mean, if we just didn't say enough. We have a witness or we have a, you know, somebody on the grass. Okay. Thank you. Okay. Thank you. In case there's something you wish to add.
judges: Kozinski, Hawkins, Cowen